**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MARVIN BARNES, *et al.* | : | Case No. 1:26-cv-00485 |
| *Individually and on behalf of all others similarly situated*, | : | Judge Jeffery P. Hopkins |
| *Plaintiffs*, | : | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | : | **JURY DEMAND ENDORSED HEREON** |
| CINCINNATI METROPOLITAN HOUSING AUTHORITY, *et al*, | : | |
| *Defendants*. | : | |

Plaintiffs Marvin Barnes, Ricky Duett, Dempsey Dejanette, Shane White, and Risha Wheeler (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this First Amended Class Action Complaint against Defendants Cincinnati Metropolitan Housing Authority ("CMHA"), Touchstone Property Services, Inc. ("TPS"), and Park Eden Evanston, LLC (the "Evanston LLC," collectively, "Defendants"). Plaintiffs' allegations are made from personal knowledge as to their own actions, their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Since its formation in 1933, CMHA has existed to provide safe, stable, and affordable housing to Hamilton County's lowest-income residents. It has betrayed that mission entirely.

2. Through a pattern of conduct spanning years across CMHA's 16 TPS-managed properties—including at 1820 Rutland Avenue, Cincinnati, Ohio 45207 ("the Evanston")—Defendants have:

a. Knowingly perpetuated defective account management systems for the setting, tracking, and adjusting of residents' subsidized rent payments, enabling the theft and overcharging of tenant rents in violation of federal law;

b. Permitted and failed to remedy this system-wide error impacting tenant ledgers, resulting in fabricated past-due balances and wrongful lease terminations;

c. Failed to adequately investigate, train, and supervise on-site employees and property managers, enabling the prolonged theft of tenant rent payments by an on-site employee;

d. Issued mass, defective Notices of 30-Day Lease Termination ("NLTs") in violation of federal regulations and Ohio law;

e. Pursued illegal lease terminations and evictions against tenants in violation of HUD guidance and Ohio law; and

f. Threatened to seek unlawful attorney fees in nonpayment eviction proceedings.

3. This misconduct is not simply an isolated incident or attributable to a wayward employee. Instead, it is the result of systemic mismanagement and complete dereliction of duty by Defendants across their portfolio of properties, as well as a widespread custom of tolerance for flagrant violations of the law and regulations governing subsidized tenancies.

4. Defendants received notice of deficient account management and property management systems, communicated internally about similar issues, and observed a series of red flags of criminal conduct, but did nothing to remedy the violations. They instead created policies and engaged in practices that allowed rampant illegality to flourish.

5. Coupled with Defendants' failure to adequately hire, train, and supervise property managers, they created an atmosphere of hostility towards and manipulation of tenants. Indeed,

Defendants hired Dion Crockett ("Mr. Crockett), despite his convictions for forgery and menacing, yet now profess shock that he exploited and stole from vulnerable tenants.

6. Defendants created an "eviction policy" that essentially gave property managers unfettered discretion over critical matters involving residents and their tenancies, including whether, when, and how to initiate the lease termination process. As CMHA launched an eviction spree in 2026, the arbitrary nature of this policy came to light—as it sought to evict tenants for as little as $50 and as much as $20,000 in alleged outstanding rent. Defendants' property managers are wielding their authority to discriminate against elderly and disabled tenants and arbitrarily deprive tenants of their housing, a process endorsed by the lawyers advising CMHA.

7. Defendants' tenants are, by definition, among Hamilton County's lowest-income residents. These individuals often lack the resources to challenge clear violations of their legal and constitutional rights, despite having the most to lose. Defendants have abused this vulnerability at every turn, including permitting and concealing the wrongful acts of employees, stonewalling residents who asked for clarification of their incomprehensible rent ledgers and attempting to recover and conceal evidence of wrongdoing.

8. Plaintiffs are current tenants[1] of CMHA/TPS whose stories demonstrate how Defendants implemented their scheme and victims' corresponding harms across the entirety of Defendants' TPS portfolio of properties.

9. Plaintiffs and Class Members are entitled to housing that complies with all applicable legal requirements. Accordingly, Plaintiffs bring this action individually and on behalf of current and former tenants of CMHA/TPS, seeking injunctive and declaratory relief, compensatory and punitive damages, and attorneys' fees.

[1] *See* Plaintiff Marvin Barnes Lease Agreement, Exhibit A. The lease agreement signed by Plaintiff Barnes is substantially similar to all leases entered by Plaintiffs and Class Members with Defendants.

**PLAINTIFFS**

10. Plaintiff Marvin Barnes is, and was at all times mentioned herein, an individual citizen of the state of Ohio and resident of Hamilton County, Ohio. Plaintiff Barnes is a current CMHA tenant who has resided at the Evanston since November 2024.

11. Plaintiff Ricky Duett is, and was at all times mentioned herein, an individual citizen of the state of Ohio and resident of Hamilton County, Ohio. Plaintiff Duett is a current CMHA tenant who has resided at the Evanston since September 2024.

12. Plaintiff Dempsey Dejanette is, and was at all times mentioned herein, an individual citizen of the state of Ohio and resident of Hamilton County, Ohio. Plaintiff Dejanette is a current CMHA tenant who has resided at the Evanston since June 2024.

13. Plaintiff Shane White is, and was at all times mentioned herein, an individual citizen of the state of Ohio and resident of Hamilton County. Plaintiff White is a current CMHA tenant who has resided at the Evanston since 2015.

14. Plaintiff Risha Wheeler is, and was at all times mentioned herein, an individual citizen of the state of Ohio and resident of Hamilton County. Plaintiff Wheeler is a current CMHA tenant who has resided at the Evanston since 2017.

**DEFENDANTS**

15. Defendant CMHA is the governmental agency that contracts with the United States Department of Housing and Urban Development ("HUD") to provide public housing to individuals with qualifying incomes in Hamilton County, Ohio. CMHA's main office is located at 1627 Western Avenue, Cincinnati, Ohio 45214.

16. Defendant CMHA is a political subdivision of the state of Ohio. *See* Ohio Rev. Code § 3735.50. Pursuant to 42 U.S.C. § 1437 *et seq.*, CMHA operates federally funded public

housing within the city of Cincinnati and Hamilton County.

17. Defendant Park Eden Evanston, LLC is an Ohio limited liability company formed by Defendant CMHA for the purpose of facilitating as a wholly owned subsidiary, which was formed for the purpose of facilitating the renovation and day-to-day operation, maintenance, management, and leasing of the Evanston. Defendant Park Eden Evanston, LLC's principal place of business listed with the Ohio Secretary of State is 1635 Western Avenue, Cincinnati, Ohio 45214.

18. Defendant TPS is an Ohio non-profit corporation that operates as the property manager for 16 CMHA-owned properties, comprising approximately 1,249 units, in addition to 110 affordable housing units, a combined portfolio of at least 1,359 units.[2] TPS's principal place of business is located at 1627 Western Avenue, Cincinnati, Ohio 45214. The properties operated by TPS include: Reserve on South Martin, Hamilton County Affordable Housing, Park Eden Apartment LLC, Pinecrest RAD LLC, West Union Square, Cary Crossing, Sutter View Apartments, Park Eden Evanston, LLC, Baldwin Grove, Marianna Terrace, LLC, Horizon Hills, Bennett Point, Riverview/San Marco, Logan Commons, LLC, Marquette Manor, LLC, and Beechwood, LLC.

## **JURISDICTION AND VENUE**

19. This action was initially filed in state court in Hamilton County, Ohio, and was thereafter removed by Defendants to this Court.

20. This action is brought under 42 U.S.C. § 1983 and under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

21. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)

---

[2] *See* https://cintimha.com/Touchstone/.

for claims arising under the Constitution and federal law.

22. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

23. This Court has personal jurisdiction over Defendants because CMHA's main office, Park Eden Evanston, LLC's principal place of business, and TPS's principal places of business are all located in this District. Additionally, Defendants have caused tortious injury by act or omission and committed violations of Plaintiffs' constitutional rights within this District.

24. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants conducted the activities giving rise to Plaintiffs' claims for relief in this District and Defendants directed their unlawful conduct at persons in this District, and because the subject of this action concerns real property located in this District.

## FACTUAL ALLEGATIONS

***Cincinnati Metropolitan Housing Authority***

25. CMHA is a primary provider of affordable housing in Hamilton County, owning and managing 5,309 public housing units, 274 units of other affordable rental housing, administering Housing Assistance Payments for over 11,600 households through the Housing Choice Voucher program, and serving more than 13,800 residents across Hamilton County.[3]

26. CMHA's self-described mission is being "a leader in the housing industry" and "providing exceptional housing opportunities while achieving high levels of customer satisfaction, promoting self-sufficiency and neighborhood stability, and being a long-term asset to the community."[4]

27. CMHA holds itself and its partners, vendors, contractors, and consultants to what

[3] *See* https://cintimha.com/about/; https://www.hamiltoncountyohio.gov/business_detail_T22_R9.php.
[4] *See* https://cintimha.com/.

it calls the "Gold Performance Standard," committing to conduct all work "with integrity, professionalism, accuracy and exceptional quality," to "hold ourselves and each other accountable," and above all to "treat one another with the respect and dignity that each of us deserves."[5]

28. As a condition of receiving federal financial assistance from HUD, CMHA is subject to comprehensive federal statutory and regulatory requirements governing all aspects of its public housing program, including requirements governing tenant notices, grievance procedures, rent calculation, ledger maintenance, lease terminations, and eviction proceedings. CMHA's failure to comply with these requirements deprives its residents of federally protected rights and exposes them to unlawful displacement from their homes.

***Touchstone Property Services, Inc.***

29. TPS operates as CMHA's property manager for 16 CMHA-owned properties, including the Evanston.

30. CMHA "established" TPS "as a wholly owned subsidiary" to assist with "planning, undertaking, developing, construction, and operation of housing for families who are low income; to develop, construct, renovate, acquire, own, lease, manage, and sell interest in real and personal property[.]"[6]

31. Pursuant to its management agreement with CMHA, TPS is responsible for the day-to-day administration of CMHA-owned properties, including:

a. Collecting rent payments;

b. Maintaining tenant account ledgers;

---

[5] *Id.*
[6] *See* https://ohioauditor.gov/auditsearch/Reports/2025/Cincinnati_MHA_2024_Hamilton_FINAL.pdf at 27.

c. Handling maintenance requests;

d. Communicating with residents regarding amounts owed;

e. Issuing NLTs; and

f. Initiating eviction proceedings.

32. At CMHA's direction, TPS has maintained a ledger system that spectacularly failed to keep accurate information and that paved the way for fraud and abuse. TPS managed the ledgers for all 16 CMHA properties and recently converted them all to a new system called Rent Café. All TPS properties utilize the same system, and all tenants pay and have their accounts maintained according to this system.

33. TPS's authority to administer public housing derives from CMHA's federal statutory authority and contract with HUD. TPS has no independent authority to administer public housing. At all times relevant herein, CMHA and TPS operated as an enterprise in the administration of CMHA's public housing program, sharing physical offices, administrative infrastructure, and operational authority over the properties and tenants at issue in this action.

***Park Eden Evanston, LLC***

34. CMHA and TPS utilize LLCs to help manage their property portfolio. Defendant CMHA formed Park Eden Evanston, LLC under Ohio law, and is the sole member of the Evanston LLC. Defendant CMHA formed the Evanston LLC to "acquire, hold, invest in, secure financing for, construct, rehabilitate, develop, improve, maintain, operate, and lease the Evanston[.]"[7]

35. Upon information and belief, the LLC exists for the purpose of holding titles to Defendant CMHA's properties and/or providing a framework for investment and financing in Defendants' properties.

[7] *See* https://ohioauditor.gov/auditsearch/detail.aspx?ReportID=8025d920-70da-4ffa-a08e-1e98de66d3a8 at 30.

***The Federal Regulatory Framework Governing Public Housing***

36. The United States Housing Act of 1937 established federal public housing as a means of supporting low-income families. 42 U.S.C. § 1437(a)(4). Public housing authorities like CMHA are required to comply with comprehensive federal statutory and regulatory requirements as a condition of receiving federal financial assistance.

37. In turn, federally subsidized tenants, including CMHA residents, have a constitutionally protected property interest in their continued tenancy pursuant to the Housing Act, HUD regulations, and their lease agreements. Absent good cause, adequate notice, and a meaningful opportunity to be heard, that interest cannot be terminated and tenants enjoy these benefits for life.

38. Upon information and belief, the Evanston has undergone a Rental Assistance Demonstration ("RAD") conversion facilitated by Defendant Park Eden Evanston, LLC.

39. As a result, Evanston residents receive project-based voucher assistance under Section 8 of the United States Housing Act, and their tenancies are governed by 24 C.F.R. § 247 and related project-based voucher regulations.

40. Upon information and belief, all properties managed by Defendant TPS include at least some units with project-based voucher assistance, such that all properties managed by Defendant TPS are subject to 24 C.F.R. § 247 and related project-based voucher regulations.

41. 24 C.F.R. § 247.4 requires that any lease termination notice: (1) state that the tenancy is terminated on a specified date; (2) state the reasons for termination with enough specificity to enable the tenant to prepare a defense; (3) advise the tenant of their right to contest the termination in a judicial proceeding; and (4) be served in the manner prescribed by the regulation. 24 C.F.R. § 247.4(a)-(b).

42. As to nonpayment terminations specifically, 24 C.F.R. § 247.4(e) requires that termination notices include:

a. The dollar amount of the balance due on the rent account and the date of such computation;

b. Instructions on how the tenant can cure the nonpayment of rent violation, including an itemized amount separated by month of alleged rent owed by the tenant, any other arrearages allowed by HUD and included in the lease separated by month, and the date by which the tenant must pay the amount of rent owed before an eviction for nonpayment of rent can be filed; and

c. Information on how the tenant can recertify their income or apply for a hardship exemption from the minimum rent requirement.

43. Defendants are further required to comply with all sections of the HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs (the "Handbook"). Per Section 8-12 of the Handbook, Defendants are instructed to "treat all tenants in an equitable and consistent manner when terminating tenancy." Defendant "must be in compliance with applicable federal, state, and local requirements when pursuing termination of tenancy," and must "adhere to termination criteria consistently and equitably."

44. The NLTs issued by Defendants to Plaintiffs and Class Members utterly fail to comply with these requirements, as described further throughout this Complaint. Defendants have pursued an affirmative pattern of mass, arbitrary, and unlawful lease terminations and evictions, treating tenants with *de minimis* or no past-due balance the same or more harshly than tenants who have not paid rent for years at a time. When confronted with obvious deficiencies in their rental accounting systems, Defendants have refused to acknowledge or correct problems—creating an

environment ripe for employee abuses.

45. Defendants recently produced their "Eviction Process" Policy in discovery (the "Eviction Policy," attached as Ex. C). That Policy was last updated in 2020, and it fails to account for federal legal changes in the NLT process in 2025. The January 2025 updates to 24 CFR 247.4 included new itemization requirements; new mandatory "instructions" on how to pay, recertify, or request a hardship exemption; and a new, explicit right to cure nonpayment violations.

46. CMHA/TPS's Eviction Policy includes specific checklists of factors that property managers must verify before serving an NLT and that attorneys must verify before filing an eviction. Yet neither property managers nor attorneys are ever instructed to check whether the account balance listed is accurate or whether the itemization of charges is sufficient. Inaccurate account balances and improper itemization translate to a denial of the tenant's right to cure nonpayment. There are no guardrails whatsoever in CMHA/TPS's Eviction Policy to prevent this outcome.

***Defendants' Failure to Implement Adequate Account Management Systems***

47. The system-wide flaws in Defendants' account management system have resulted in residents accruing inaccurate balances. Coupled with residents' incomprehensible ledgers, many tenants have experienced fabricated balances, wrongful NLTs, and illegal eviction threats or proceedings as a consequence of these inaccurate balances.

48. This deficiency is—or should have been—well known to Defendants.

49. At the Evanston, for example—as early as Mr. Crockett's performance review for April 1, 2023 through June 30, 2023—his supervisor Barbara Jeff noted that "Dion has found file errors from previous staff and [is] working to address them" and that "[t]here are no known tenant account errors" and "no current MOR's[.]" Again, on November 11, 2023, Mr. Crockett's

performance review indicated that "[f]ile errors are being addressed- Dion has seen some errors that may require correction" and that "[t]enant account issued are being addressed- Dion is meeting with residents to address ledger concerns[.]"

50. The pattern of problems with tenant rent accounts surfaced from many different sources. On March 13, 2025, Judy M. Harrison spoke with Mr. Crockett in her capacity as Mercy Neighborhood Ministries' Manager of Senior and Supportive Services, and on behalf of a CMHA tenant, regarding a wrongful past-due balance.

51. During this conversation, Mr. Crockett informed Ms. Harrison that one tenant's past due balance was the result of a system-wide error in Defendants' account management program, and that no outstanding payments were owed. The manager stated that "the continued presence of the $522.00 back balance is in the process of being removed from his statements. However, the correction will take an undetermined amount of time, due to the fact that it is from a *system-wide computer programming error* and the fix will be for *all of the Touchstone Properties*." *See* Letter to TPS from Mercy Neighborhood Ministries (emphasis added), attached as Ex. B.

52. Thereafter, on March 13, 2025, Ms. Harrison sent a letter summarizing this conversation to Defendant TPS—meaning that Defendants received notice of portfolio-wide accounting problems at least by this date. *See id*.

53. The red flags kept coming. Later, in April, a series of emails between Mr. Crockett, Christy Stuckey, and Monica Mitchen (a Reconciliation Specialist) discussed issues with Plaintiff Barnes' ledger. On April 13, 2025, Monica Mitchen responded to Mr. Crockett and Ms. Stuckey that "It sounds like the ledger needs to be cleaned up."

54. Despite appreciating that a system-wide error existed, Defendants did nothing to remedy the problem. Indeed, they exploited it by seeking to perpetrate mass evictions—all while

allowing systemic theft and abuse of their tenants.

***Two Years of Manager Theft and Exploitation at Defendants' Properties***

55. Between 2023 and 2025, Dion Crockett worked as TPS's on-site property manager at the Evanston, a complex composed of approximately 100 units managed by TPS.[8] Mr. Crockett also worked at other locations (such as "Riverview") and substituted for property managers at Defendants' other properties when those managers went on leave or vacation, such that he possessed temporary authority as a property manager at numerous other properties.

56. As Defendants' agent and representative, Mr. Crockett was entrusted with wide-ranging duties, including onboarding new subsidized tenants; calculating resident rent shares and handling income recertifications; accepting payment of security deposits and rents; and communicating with residents about their rent accounts. Residents at the Evanston and other locations were directed by Defendants to engage with Mr. Crockett for all these critical aspects of their subsidized tenancies. Mr. Crockett also possessed unfettered, discretionary authority to issue NLTs to any tenants believed to be behind on their rent payments.

57. Mr. Crocket was well-aware of the Defendants' system-wide accounting errors and lack of supervision of property managers. Over the course of years, he chose to exploit both factors to steal from Defendants' tenants.

58. Throughout his tenure at CMHA/TPS, Mr. Crockett abused his authority to steal from residents. A key facet of his scheme involved persuading vulnerable residents to pay their rent via money orders with the "To" line left blank. Mr. Crockett accomplished his scheme by telling residents that they had filled out prior orders incorrectly and/or that they lacked necessary

---

[8] *See* https://ohioauditor.gov/auditsearch/Reports/2025/Cincinnati_MHA_2024_Hamilton_FINAL.pdf at 27.

information, such as their apartment unit's unique "T" number.[9] (Representative examples attached as Ex. D). Mr. Crockett repeatedly assured residents that he would deposit their funds with CMHA and ensure that payments were credited to their rent ledgers.

59. Instead, Mr. Crockett filled out (or sometimes forged) residents' blank money orders to be paid to himself and sometimes his acquaintances. On other occasions, Mr. Crockett convinced residents to pay their rent and security deposits in cash, which he pocketed.

60. Because Mr. Crockett diverted residents' money orders and cash payments to himself (instead of crediting them to residents' accounts) many of the affected residents began accruing past-due balances on their accounts.

61. To conceal his theft, Mr. Crockett refused residents' requests to produce rental ledgers and opted not to issue nonpayment NLTs to the residents he was stealing from. He further exploited CMHA's incomprehensible ledgers and deficient rental account management systems to convince residents that they owed rent when, in fact, he had stolen their payments. On some occasions, he improperly set residents' rent shares above the maximum amount permitted by federal law (42 U.S.C. § 1437a(a)), then threatened to evict when residents could not keep up with the heightened payments.

62. At all times relevant to Mr. Crockett's theft scheme, Defendants maintained access to their own records of residents' rent accounts at the properties where he operated. They keep track of rental payments in real-time and could have easily spotted his scheme. Rather than investigate the past-due balances or ensure that residents had access to coherent ledgers, Defendants perpetuated the derelict and deficient account management systems that, in turn,

---

[9] *See* https://local12.com/news/local/cincinnati-housing-tenants-allege-rent-money-misused-property-manager-metropolitan-home-authority-cmha-misusing-money-cash-funds-rent-renting-renters-payments-evanston-complex-check-city-council.

enabled Mr. Crockett's theft and overcalculation of rent shares.

63. Mr. Crockett routinely harassed residents, with disproportionate focus on female, disabled, and elderly residents, about nonpayment of rent, threatening eviction if they did not pay the amounts he demanded. Upon information and belief, this routine harassment caused residents to pay Mr. Crockett and CMHA funds in excess of their maximum rent share permitted by 42 U.S.C. § 1437a(a).

64. Notes from his performance reviews indicate Defendants' rising awareness of Mr. Crockett's misconduct. A July 31, 2025 note states that they "[w]ould like Dion to work on remaining calm in the face of challenges with residents[,]" while a note from November 14, 2025 states the need for "improved control over negative reactions and behaviors that impact his performance." Yet, in that same November review, it was still maintained that "Dion is very honest. He will always communicate the truth good or bad."

65. Even after Mr. Crockett's departure, many residents directly impacted by his scheme remain terrified that their subsidized tenancies will be terminated due to incorrect positive balances on their accounts. The theft and exploitation that occurred at the Evanston is the natural consequence of the portfolio-wide system that CMHA and TPS created.

***CMHA's Failure to Follow Federal Lease Termination and Eviction Laws***

66. Since at least the start of 2026, CMHA and TPS have embarked on an extraordinary eviction spree. Defendants have already filed an excess of 200 evictions in 2026 alone, more than double the number of evictions filed at this time last year.[10]

67. These misdoings are part of an official policy advanced by CMHA/TPS.

68. CMHA's General Counsel, Geri Hernandez, assured CPD Detective Laurie Shatzer

[10] These numbers are generated by searching the Clerk of Courts' website for municipal civil cases including CMHA as a party and filed within the stated date ranges.

as early as January 20, 2026 that "CMHA/TPS has NOT filed evictions against any of the tenants who've said they provided money orders for their rent to Dion Crockett." But, behind the scenes, CMHA/TPS was moving forward with a mass eviction at the Evanston (and portfolio-wide).

69. Rather than actually solve the problems inherent in their ledger system or address the scandal engulfing their properties, CMHA/TPS leaders decided to focus their efforts on evictions. In a February 11, 2026 email to Christy Stuckey, Vernal Moore requested that she "set up a meeting with all the managers on this email to confirm (Look at the NONPayments) for Friday to ensure that the notices were completed and served. The rent collection is below an 80% and it is not acceptable. I also would like your recommendation on how this will improve or what changes we need to make to ensure we are collecting the rent this year as expected[.]"

70. That same day, Moore emailed TPS Property Managers:

> Please see the rent collections for Feb. These are not where we should be on the 11th of the month. If you have not served the Non-Payment Notices these must be out by the end of the day tomorrow. Remember that rent collection is imperative and is a major part of your job responsibilities. Once you complete your Non Payments make sure they are uploaded in the TEAMS file. It will be reviewed on Friday.

71. The next month, on March 11, 2026, Mr. Moore circulated a similar reminder to "see rental payments for your property as of 3/11/2026" and "ensure that you have given out the notices to pay and called all individuals owing rent." CMHA/TPS management thus initiated an eviction spree even in the midst of recognizing that it could not understand its own ledgers.

72. This is in direct conflict with the CMHA/TPS Eviction Policy, which states that "[e]xceptions to the rent collection practice will be made for instances of non-payment which arise due to circumstances beyond the tenant's control. Examples of these instances include: Lost or stolen money order[s.]"

73. It was in the face of this policy that Defendants moved forward with serving 56

NLTs at the Evanston and countless more across the TPS portfolio of properties. (Representative example attached as Ex. E).

74. Various individuals contacted Defendants thereafter with concerns.

75. On April 13, 2026, HUD employee Bonnie Spurling emailed Mr. Moore and Ms. Stuckey informing them that she "received voicemail messages on Friday, 4/10/26 advising that 'a lot of residents' received lease termination notices. Some indicated that they had rent receipts but receive a lease termination notice."

76. Mr. Moore responded that "TPS issued Non-Payment Notices to residents who had not submitted their rent by April 5. … Our goal is to strengthen rent collection efforts while continuing to provide safe, affordable housing."

77. The Cincinnati Police Department expressed similar concerns as HUD. On April 16, 2026, Detective Shatzer emailed Ms. Hernandez asking, "[w]ere there 56 evictions served last Saturday on these people at Rutland [the Evanston]?"

78. It took nearly a month for Ms. Hernandez to respond. On May 9, 2026, she explained the nature of Defendants' conduct:

> We haven't filed any NPR eviction cases for Evanston residents. We won't be filing any NPR evictions on them for the near future. The process of filing an eviction starts with serving 30-Day Notices and then a 3-Day Notice before we'd even file. We've served 30-Day Notices to try and get people's attention who haven't already come forward. That's now caused a TRO, etc. to be filed against us by attorney Pierre Bergeron.

79. The practical effect of Defendants' NLTs *is* to initiate the eviction process, contrary to Ms. Hernandez's denial. Moreover, the characterization of NLTs as a means of "get[ting] people's attention" contradicts the purpose of NLTs in federal law and CMHA's own eviction policies.

80. Defendants' new policy and demonstrated pattern of aggressive lease termination

and eviction is necessarily authorized by decisionmakers with final policymaking authority within CMHA/TPS, and it has placed hundreds of families at imminent risk of homelessness.

81. Moreover, Defendants' historic polices regarding eviction processes are in direct violation of applicable law. The CMHA/TPS Eviction Policy expressly provides that, "[i]f an eviction is filed against a tenant, TPS will accept late rent up until the day before the scheduled court date *on the condition that the tenant* pays their balance in full and *agrees to reimburse TPS for the court costs.*" (emphasis added). Other aspects of the Policy require the imposition of "Legal Charges."

82. This is outright barred by the Ohio Landlord Tenant Act, which states that "No agreement to pay the landlord's or tenant's attorney's fees shall be recognized in any rental agreement for residential premises or in any other agreement between a landlord and tenant." R.C. § 5321.13. CMHA/TPS do not have a provision in their lease requiring fee-shifting (because that would be illegal), but their Policy seeks to do through the backdoor that which they are barred from doing through the front. Either way, it is illegal.

83. The Eviction Policy explicitly refers to the OLTA and Ohio law obligations, emphasizing that CMHA/TPS "must strictly adhere to both federal regulations and Ohio's Landlord Tenant Act." In other words, at all relevant times, Defendants recognized that they were beholden to the terms of the OLTA but violated them anyway.

84. Moreover, the Eviction Policy places various obligations upon the legal department—including Ms. Hernandez—in investigating and pursuing evictions. Specifically, that

> "Property management should work closely with the Legal Department to ensure the referrals are processed in accordance with this procedure" and that "[t]he Legal Department is responsible for verifying the sufficiency of the eviction filing. When reviewing the referral, the responsible attorney will review all notices in the referral packet. If the notices are not sufficient, the attorney must notify the property manager of the deficiency and cannot file the eviction until the deficiency is

remedied."

85. Despite this, on at least one occasion in 2026, CMHA filed an eviction proceeding against a resident based on an NLT with a $0 account balance listed. Upon information and belief, CMHA's counsel refused to dismiss the proceeding even after the zero balance was brought to counsel's attention, arguing in court that CMHA was not required to state the correct balance on its NLT and should be allowed to proceed with the eviction.

86. CMHA has pursued many other 2026 evictions—and obtained eviction judgments—where the balance listed on the NLT did not match the rental ledger attached to the NLT and/or the eviction complaint. Because many CMHA tenants were forced to defend against the eviction actions without legal counsel, many of these discrepancies were never brought to the attention of the municipal court.

87. CMHA has also, on multiple occasions, pursued evictions against residents who had already entered into repayment agreements and were making timely payments in full compliance with their terms, a practice that is unlawful under Ohio law and contrary to applicable HUD guidance.

88. In evictions filed for nonpayment of rent, CMHA routinely pursues legal fees prohibited by Ohio Rev. Code 5321.13 and conditions dismissal of those proceedings on residents' payment of those fees, a practice that is unlawful under Ohio law and constitutes an abuse of the eviction process. CMHA threatened to pursue court costs and legal fees prohibited by Ohio Rev. Code 5321.13 in all of the NLTs issued to Plaintiffs at the Evanston on April 8, 2026.

***Defendants' Inadequate Hiring, Supervision, and Training of On-Site Employees***

89. Defendants have perpetrated this unlawful eviction spree with the advice of its General Counsel guiding it every step of the way. CMHA/TPS have an "Eviction Policy" that it

relies upon in illegally evicting its tenants. Beyond the problems detailed above, this scheme has been carried out in an arbitrary and inconsistent manner. That is because Defendants have intentionally failed to hire, supervise, and retain their employees to meet minimum regulatory compliance and constitutional standards.

90. These hiring decisions have subjected Plaintiffs and Class Members to great harms.

91. As an illustration, between approximately 2023 and 2025, Mr. Crockett was employed by CMHA/TPS as an on-site property manager at the Evanston and, for a period of time, Acting Property Manager at the Riverview/San Marco, located at 2538 Hackberry Street, Cincinnati, OH 45206.

92. In this role, like all of Defendants' on-site property managers, Mr. Crockett had the authority to collect residents' rent payments and the discretion to move forward with eviction notices. In performance review notes from August 10, 2023, his supervisor noted that "Dion has worked to increase the occupancy for the Evanston" and "is working with residents to address rent collection. All outstanding balances must be addressed by the end of 2nd qtr. This process has began in increments of residents[.]"

93. Defendants had no qualms elevating Mr. Crockett to this position, despite his having "a number of civil and criminal cases brought against him."[11] Among Mr. Crockett's criminal charges are a forgery conviction from 2002 and a menacing conviction as recently as 2023.[12]

94. In fact, Mr. Crockett's supervisors spoke highly of him in his performance reviews.

95. On August 9, 2023, Mr. Crockett's supervisor stated that "He shows a level of

---

[11] *See* https://local12.com/news/local/federal-lawsuit-filed-cmha-cincinnati-metropolitan-housing-authority-property-manager-arrested-rent-theft-renting-thief-forgery-tampering-records-renters-house-apartment-homes-evict-eviction-civil-rights-violations-hamilton-county.

[12] *Id.*

trustworthiness and professionalism with internal and external customers. Dion represents the agency in a positive light and shows the ability to perform his assignments without excessive errors."

96. Only months later, on November 13, 2023, Mr. Crockett's supervisor stated that he "[c]onducts business in an honest and ethical behavior. Maintains professionalism and upholds the guidelines of the Agency. Stays current in process, regulations and training opportunities."

97. In performance notes dated January 26, 2024, Mr. Crockett's supervisor stated that "Dion is trusted and abides by the company's ethics standards and is a good representative of the Agency. He stays current in processes, regulations, and procedures."

98. In fact, as late as July 31, 2025—months after Defendants had been alerted to issues with tenant ledgers—Mr. Crockett's performance review stated that "Dion can always be counted on to tell the truth and make ethical decisions. No matter what the situation, Dion is going to state the facts."

99. Incredibly, Defendants granted Mr. Crockett a raise effective October 1, 2025, in recognition of his being assigned Acting Property Manager at Riverview/San Marco, in addition to the Evanston.

100. Yet, by November, following months of repeated complaints by residents, notes from Mr. Crockett's supervisor state that "he needs to more actively pursue staying current with all CMHA processes, regulations, and procedures that impact HUD and Tax Credit compliance" and that "Recertifications have not been completed timely which has resulted in a voucher delay." Despite these obvious deficiencies and other red flags, Mr. Crockett remained employed by Defendants with full ability to exploit tenants and their tenant accounts. No one was actually looking over his shoulders.

101. Mr. Crockett exploited Defendants' deficient account management system to steal from tenants. He presumably knew that no one from CMHA or TPS would be able to understand his theft because the ledger system and accounting process were rife with problems.

102. Defendants' negligent hiring, supervision, and retention is not isolated to Mr. Crockett. Rather, Mr. Crockett exemplifies the extent of the harms made possible due to Defendants' lack of investigation, training, and oversight across its properties. Other property managers have, on information and belief, taken measures like renting out units to friends/acquaintances off of CMHA/TPS's books. If CMHA or TPS had a coherent system of oversight over its property managers, it would have long ago discovered these illegal acts.

103. By effectively offloading all supervisory decisions regarding residents' rent payments, ledgers, communications regarding amounts owed, the issuance of NLTs, and initiation of eviction proceedings to individual on-site property managers—without adequate monitoring, training, or enforcement of systemic standards—Defendants enabled a scheme wherein individual employees were permitted to violate residents' constitutional rights with impunity. Defendants knew of or were deliberately ignorant to the rights-violations that predictably ensued.

***Defendants' Refusal to Acknowledge or Correct the Consequences of Crockett's Theft and Their Own Deficient Accounting***

104. Despite being repeatedly alerted to Mr. Crockett's questionable behavior and fraud, Defendants failed to timely investigate or limit Mr. Crockett's access to tenants, their payment methods, and their accounts.

105. In a series of emails between Mr. Crockett and Ms. Stuckey regarding Marvin Barnes' account, Ms. Stuckey explicitly told Mr. Crockett: "We will need paystubs from him. I will let him know or do you have them?"

106. In August 2025, Plaintiff Barnes had a meeting scheduled with CMHA CEO Greg

Johnson to discuss Mr. Crockett's abuses. When Johnson learned about this on August 13, he was outraged, instructing his subordinate, Christy Stuckey, to cancel it: "Can you try to talk to him so we don't have to have the meeting. That's really my preference." CMHA/TPS's refusal to appreciate the epic fraud growing around them went straight to the top of the organization.

107. A few months later, on November 3, 2025, Lori Griffith, another Property Manager emailed Ms. Stuckey asking her to review a tenant's ledger, explaining "[b]ack in 2020 it shows 4 different charges for a security deposit - the original lease states that the security deposit was only $314 and was paid. I believe the other 3 charges [totaling] $1256 need to be reversed. Also, there was double rent charged in March and April of 2020 for $309 each that looks to need removed."

108. It was not until late November 2025 when CMHA/TPS even started to listen to its tenants.

109. On November 25, 2025, Marica Butler, an HR representative, contacted Ms. Stuckey and other employees of Defendants alerting them to a tenant's experience wherein "she gave money orders for her rent to Dion Crockett since she was having trouble with the rent café when she moved in, she states he advised her to [file] the money orders blank and just sign them. [S]he has had them traced and she states they show he cashed the money orders. This has been going on from April 2025-Sept 2025. … She was not comfortable with approaching Dion and wants you to call her to discuss this situation." Despite this, Mr. Crockett remained employed by Defendants with complete access to tenant accounts for nearly another week.

110. It was not until December 1, 2025 that Defendants made the decision to "terminate all access for Dion Crockett, effective immediately."

111. Defendants failed to take restorative action for over a month following Mr. Crockett's termination. In response, on January 14, 2026, Evanston residents, including Plaintiffs

Marvin Barnes, Dempsey Dejanette, and Shane White, testified before Cincinnati City Council regarding Mr. Crockett's theft.[13]

112. CMHA confirmed that Mr. Crockett has not worked for any CMHA properties since December 2025 and that all information regarding his conduct has been turned over to the Cincinnati Police Department.[14]

113. At this point, Defendants possessed complete access to the Evanston's tenant account ledgers, rent payment records, and money order histories covering the entirety of Mr. Crockett's tenure from 2023 through December 2025. Defendants knew, or should have known, that residents' account balances had been systematically corrupted during this period. Their record-keeping system was in shambles.

114. Indeed, Defendants had known that residents' account balances had been systematically corrupted across TPS's properties due to the deficient account management system across their portfolio since at least March 2025, yet they did nothing.

115. Defendants' failure to detect, investigate, or remedy Mr. Crockett's conduct during the two years it persisted reflects either actual knowledge of that conduct or a deliberate decision to remain ignorant of conditions in their own rental accounts.

116. Upon information and belief, Defendants did not: audit the affected balances following Mr. Crockett's termination; issue corrected ledgers; implement safeguards for accounts known or suspected to be affected; or provide residents with reliable mechanisms to identify and dispute theft-related errors. Certainly, none of the documents produced by Defendants to date have included any audit, engagement of any outside consultant, or the use of any expert to determine or

---

[13] *See* https://signalcincinnati.org/2026/01/20/city-council-denounces-ice-shooting-with-resolution/.

[14] *See* https://local12.com/news/local/cincinnati-housing-tenants-allege-rent-money-misused-property-manager-metropolitan-home-authority-cmha-misusing-money-cash-funds-rent-renting-renters-payments-evanston-complex-check-city-council.

investigate the extent of these deficiencies and misconduct. Instead, CMHA/TPS tasked three internal employees to "investigate"—all of whom had no incentive to actually get to the bottom of the matter because it might involve revealing their own culpability or negligence.

117. Shortly after Mr. Crockett's termination, CMHA CEO Greg Johnson appeared on the Lincoln Ware program and publicly assured CMHA residents that an investigation was ongoing and that no residents would face eviction due to missing funds. This statement was knowingly inaccurate or made with reckless disregard for its accuracy.

118. Mr. Johnson declined to work with or meet tenants with concerns regarding Mr. Crockett's misconduct, as evidenced by seeking to avoid meeting with Mr. Barnes in August. Instead, his subordinates directed and implemented a mass eviction policy.

***Defendants' Mass Termination of Subsidized Tenancies at the Evanston***

119. With the walls caving in on CMHA and TPS, Defendants elected to adopt a policy of mass evictions to silence and intimidate tenants. Although this policy had been implemented across CMHA/TPS's portfolio at the start of 2026, nowhere was it on more vivid display than at the Evanston.

120. Despite CMHA's public assurances that it would not evict Evanston residents, on April 8, 2026, TPS issued 30-Day Notices of Lease Termination (or "NLTs") to, upon information and belief, more than 50 Evanston residents—affecting over half of the complex's units.

121. Defendants issued these NLTs despite repeat acknowledgements that they were still "investigating" Crockett's theft at the Evanston. Defendants insisted on blaming any and all ledger irregularities on Crockett's theft—and refused to acknowledge the bigger, more systemic problems infecting their entire ledger system.

122. And even the "investigation" was haphazard or inept. Nearly six months after

(finally) recognizing Crockett's fraud, Ms. Hernandez admitted on May 9, 2026 that "Crockett was running a scam I'll never be able to figure out, but I think we need to keep investigating. … CMHA really needs to know where these people's money went; in addition to the cash, but I realize the cash isn't possible." Then, on May 12, 2026, she stated that "[t]he TPS team will have to keep digging. … I'm not suggesting we hold up the grand jury proceedings, but like I said, the agency has to keep digging."

123. Six months after CMHA/TPS belatedly recognized Crockett's scheme, Defendants admit that they still don't know all of the information surrounding it. Upon information and belief, Defendants' ignorance is the deliberate result of their refusal to take a hard look at system-wide problems or bring in an outside auditor or consultant to investigate. Forced to acknowledge Crockett's misdeeds, they sent a few emails and convened a few calls—but otherwise buried their heads in the sand.

124. On the one hand, Defendants have portrayed themselves to law enforcement as the "victim" of Crockett's scheme. On the other, they have marched forward with an eviction spree against the true victims—their own tenants—and refused to critically look at their own practices.

125. It was under these circumstances that Defendants circulated the April 8 NLTs to Evanston residents, which stated: "Your Lease Will Be Terminated for Nonpayment of Rent 30 Days After This Notice is Provided." (Emphasis in original.) The date of lease termination was set "at midnight on May 9, 2026."

126. Defendants' NLTs further threatened that, if residents did "not move on or before the termination date," CMHA could "seek to enforce the lease termination through judicial action (eviction case)" and "require [residents] to pay the costs of court" and "attorney's fees."

127. Many of the NLTs included past-due rent balances that were a direct result of Mr.

Crockett's theft, including payments that residents already made to Mr. Crockett.

128. Other NLTs alleged past-due balances that are simply incorrect—a result of Defendants' failure to properly adjust residents' rent shares to match their incomes and complete timely recertifications, its imposition of arbitrary and improper fees, and its inability to accurately track account balances over time.

129. For example, Plaintiff Dejanette received an NLT in which CMHA threatened to terminate his subsidized tenancy for a total balance of $1. Yet the ledger attached to that same NLT asserted a staggering past-due balance of $7,952—despite the fact that Plaintiff Dejanette has a subsidized rent share of just $25 dollars and has lived at the Evanston for less than two years.

130. Residents who expressed concern about the NLTs were told that, in order to avoid adverse action based on the stolen payments, they must file police reports regarding Mr. Crockett's theft. This is a patent misstatement of the law governing CMHA/TPS's duties surrounding lease termination. Indeed, these statements were made to cover up CMHA/TPS's complicity in Mr. Crockett's scheme. Tenants impacted by the NLTs were not given reliable access to their ledgers or meaningful opportunities to meet with management.

131. Instead, after news of the April 8 NLTs was reported in local media, CMHA representatives went door-to-door asking residents to surrender their NLTs—a blatant effort to destroy evidence of Defendants' unlawful conduct.

132. At the time Defendants undertook that conduct, Defendants had actual knowledge that litigation was probable, as evidenced by: (1) active Cincinnati Police Department investigation into the theft scheme against Evanston residents; (2) Defendants' own statements threatening to initiate eviction proceedings; (3) public media coverage across multiple Cincinnati news outlets; (4) resident testimony before Cincinnati City Council; and (5) residents' open organization and

pursuit of legal remedies, including the submission of written grievances.

133. Upon information and belief, Defendants attempted to recover this evidence willfully and deliberately with the intent of eliminating documentary proof of the specific past-due balances alleged therein, the dates of issuance, and the identities of recipients, and to impede Plaintiffs' ability to prosecute this action.

134. The mass issuance of the April 8 NLTs at the Evanston caused immediate (and predictable) panic and emotional distress for residents. Upon information and belief, one elderly resident was so distraught that she began giving away valuable possessions in preparation for a forced move on May 9. Other residents relinquished their NLTs to CMHA representatives, resulting in the loss of critical evidence.

135. Yet, according to Defendants' General Counsel, Ms. Hernandez, these NLTs were filed simply to "get people's attention who haven't already come forward."

136. Worse yet, review of relevant court records and the events at the TPS-run properties demonstrates that Defendants are pursuing these mass evictions wholly without regard for the accuracy of their own rental records and accounts. Defendants are proceeding with evictions based on NLTs that are plainly inconsistent with applicable state and federal law pertaining to the eviction of tenants in federally funded, low-income housing—thereby depriving hundreds of families of their subsidies without due process of law.

137. The ledgers attached to the mass NLTs issued to Evanston residents on April 8, 2026, are facially inconsistent with 24 C.F.R. § 247.4(e), which requires termination notices to include an itemized amount of alleged rent owed separated by month. Instead, charges of varying amounts are introduced and removed from residents' accounts without explanation. Many of these charges do not correspond with residents' rents, and a lack of any coherent labeling system renders

it impossible for recipients of the NLTs to discern what the charges are for and when they accrued.

138. Unexplained lump sum charges—up to thousands of dollars in a single day—cause residents' rent account balances to oscillate wildly up and down. Indeed, it is clear from the Evanston NLTs that Defendants themselves cannot ascertain a single, fixed number for what they claim their tenants owe.

139. For example: the first page of Plaintiff Duett's NLT states a balance due of $2,263.00, while his attached ledger asserts a balance of $4,545.00. The first page of Plaintiff Dejanette's NLT states a balance due of $1, while his attached ledger asserts a balance of $7,952.00. No explanation is provided for either discrepancy. Plaintiff Barnes's NLT states a balance of $387, while his attached ledger reflects a balance of $3,221.00, and his RentCafe account, as of April 21, 2026, stated a balance of $438. These inconsistencies have never been addressed or explained by Defendants.

140. All of Plaintiffs' ledgers contain large, retroactive bulk adjustment entries that introduce and remove sometimes thousands of dollars of charges across prior periods without explanation. These bulk adjustments render it impossible for a tenant to identify which months' rent is disputed, what amount is actually owed, what amount is the result of errors with Defendants' account management system, or what portion of the alleged balance is attributable to Mr. Crockett's theft.

141. The only thing that derailed CMHA/TPS's scheme to hide its own misconduct through mass evictions was court intervention. On May 8, 2026, Judge Wende C. Cross of the Hamilton County Court of Common Pleas granted Plaintiffs' motion for a temporary restraining order against Defendants, enjoining Defendants from initiating, continuing, or otherwise pursuing evictions or lease termination proceedings based upon nonpayment of rent against current

Evanston residents and from seeking to collect alleged past due balances from Evanston residents.

142. Following Defendants' removal of this action to this Court, this Court entered a Stipulated Order for temporary injunctive relief on behalf of the Evanston tenants until August 17, 2026. See ECF No 5.

143. That injunction prohibited CMHA/TPS from taking any steps to collect any past-due rent from Evanston tenants prior to June 1, 2026. Despite the clarity of that language, and the fact that CMHA/TPS *agreed to it*, on June 12, TPS sent a wave of notices to Evanston tenants seeking to collect alleged past-due rent. This effort directly violated this Court's order. After undersigned counsel alerted defense counsel to this action, he appropriately intervened to prevent his client from further violating the Court's order.

144. The public, and especially the tenants of CMHA/TPS, should expect that a public housing entity supported by tax dollars will follow the law and comply with court orders. The fact that it can't or won't is endemic of a systemic and foundational problem.

## PLAINTIFFS' EXPERIENCES

***Plaintiff Marvin Barnes's Experience***

145. Plaintiff Barnes entered into a residential lease agreement with Defendant CMHA for the Property on November 12, 2024, at a monthly rent of $545, subsequently increased to $747. That lease incorporated CMHA's obligations under Chapter 5321 of the Ohio Revised Code and applicable federal law.

146. During his tenancy, Plaintiff Barnes was subjected to Mr. Crockett's theft scheme. On four separate occasions, Mr. Crockett instructed Plaintiff Barnes to leave the "To" line of his money order payments blank. Mr. Crockett told Plaintiff Barnes he did not yet have "the right information to write in there" (specifically a "T number" used to assign the payment to a unit) and

represented that he "would fill that information when he gets the information from corporate, downtown." Plaintiff Barnes complied with these instructions for four months before switching to personal checks, which he did precisely because he recognized that checks "wouldn't get interfered with."

147. Thereafter, Plaintiff Barnes discovered that one money order dated November 26, 2024, had the "To" line filled in with Dion Crockett; that another money order dated November 14, 2024, had the "To" line filled in with Dion Crockett and the "From" line filled in with Brad Dunn; and that a third money order dated December 31, 2024, had the "To" line filled in with Dion Crockett and the "From" line filled in with Thomas Moore. Plaintiffs Barnes does not know either Brad Dunn or Thomas Moore.

148. After switching to personal checks, Plaintiff Barnes continued making timely rent payments each month. He has also made payments through Rent Café since that system was introduced, which occurred at a meeting convened by Mr. Crockett at which residents were told they could come to the office to be "set up" with access if they experienced any difficulties.

149. Despite making timely rent payments, Plaintiff Barnes began receiving account statements reflecting a past-due balance of $387 that he believes is inaccurate. Additionally, his ledger contains entries he cannot reconcile: a $727 payment he never made, entries labeled as "cell phone payments," a $4,160 charge that appears to have been credited out, an unexplained $3,452 balance, and numerous other credits and adjustments that do not correspond to his actual payment history. Plaintiff Barnes has been unable to obtain any adequate explanation from Defendants.

150. On or about April 8, 2026, Plaintiff Barnes received an NLT from Defendant TPS alleging a past-due balance of $387. Upon information and belief, the alleged balance is attributable at least in part to Mr. Crockett's theft of Plaintiff Barnes's blank money order

payments. The NLT's stated balance is inconsistent with and irreconcilable with Defendants' own ledger records for Plaintiff Barnes's account, which reflect a substantially higher and incorrect outstanding balance.

151. Plaintiff Barnes engaged in protected activity under Ohio Rev. Code § 5321.02 by filing a police report regarding Mr. Crockett's theft (Incident Number 2026-INC-001776); testifying before Cincinnati City Council; and speaking to the media. In direct response to this protected activity, Defendants threatened eviction and have refused to reverse the April 8, 2026 NLT despite Plaintiff Barnes's repeated attempts to resolve the matter directly with management.

152. As a direct and proximate result of Defendants' conduct, Plaintiff Barnes has suffered financial harm from the theft of his rent payments, exposure to fabricated past-due charges and the resulting threat of eviction, and significant emotional distress.

***Plaintiff Ricky Duett's Experience***

153. Plaintiff Duett entered into a residential lease agreement with Defendant CMHA for the Property in August 2024, but he moved into his apartment at the Evanston in September 2024. That lease incorporated CMHA's obligations under Chapter 5321 of the Ohio Revised Code and applicable federal law.

154. During his tenancy, Plaintiff Duett was subjected to Mr. Crockett's theft scheme. On at least one occasion, Mr. Crockett instructed Plaintiff Duett to not put Touchstone on his money orders for rent. Plaintiff Duett was told by Mr. Crockett that Mr. Crockett would instead fill out the money order. Plaintiff Duett was then told that CMHA received his money order. A CMHA representative later came to Plaintiff Duett's door and told him that he owed rent for April of a prior year, but later recanted and told Plaintiff Duett that they found his payment. The experience made it clear to Plaintiff Duett that Defendants' account records were unreliable and

that Defendants were not properly tracking payments made.

155. Despite making timely rent payments, Plaintiff Duett began receiving account statements reflecting fabricated past-due balances. The balance shown has fluctuated, showing balances of $2,263 and $4,545. Plaintiff Duett attempted on multiple occasions to obtain an accurate ledger from Defendants. To date, no accurate ledger has been provided.

156. On April 8, 2026, Plaintiff Duett received an NLT from Defendant TPS alleging a past-due balance, the first page of which claimed a past-due balance of $2,263. The ledger attached to the NLT, however, claimed an incompatible balance of $4,545.

157. The rent listed at the top of the ledger attached to Plaintiff Duett's NLT is $688. This number is wholly inaccurate: the remainder of the ledger demonstrates that Plaintiff Duett's rent share has never been $688. Yet Defendants' accounting inconsistencies grow only more indecipherable as the ledger progresses.

158. Repeated "HAP adj" charges ranging from $46 to $656 drive Plaintiff Duett's balance ever-higher over time. Lump sum charges and credits cause Plaintiff Duett's balance to dip as low as -$5,068, then fly up to $4,545, despite his consistent payment of his monthly rent share. The charges are not clearly labeled, and it is impossible for Plaintiff Duett to pinpoint from the ledger the months in which his alleged balance accrued or the source of the unknown charges. Upon information and belief, these charges are well in excess of Mr. Duett's maximum permissible rent share set by 42 U.S.C. § 1437a(a).

159. Plaintiff Duett attempted on multiple occasions to obtain an accurate itemized ledger from Defendants, with no success. Since the April 8 NLT was issued, the balance reflected on Defendants' rent portal for Plaintiff Duett's account has continued to be inconsistent.

160. CMHA's assessment of charges beyond Mr. Duett's proper rent share and its failure

to produce a coherent, itemized ledger to accompany its proposed lease termination constitutes an ongoing violation of federal law.

161. Plaintiff Duett engaged in protected activity under Ohio Rev. Code § 5321.02 by attempting to complain to Defendants about his alleged past-due balances on April 13, April 14, and April 15, 2026, and filing a police report regarding Mr. Crockett's theft on or about April 21, 2026, Incident Number 2026-INC-007398. In direct response, Defendants issued an NLT to Plaintiff Duett on April 8, 2026.

162. As a direct and proximate result of Defendants' conduct, Plaintiff Duett has suffered damages, including the threat of wrongful eviction, financial harm in the form of excessive and fabricated charges, potential damage to his housing record, potential loss of his housing subsidy, and emotional distress and anxiety.

***Plaintiff Dempsey Dejanette's Experience***

163. Plaintiff Dejanette entered into a residential lease agreement with Defendant CMHA for the Property in June 2024. That lease incorporated CMHA's obligations under Chapter 5321 of the Ohio Revised Code and applicable federal law. At or around the time of move-in, his monthly rent share was set by CMHA and Mr. Crockett at $682, an amount significantly in excess of what was permitted by 42 U.S.C. § 1437a(a) based on Plaintiff Dejanette's income.

164. One of the CMHA/TPS property managers who later succeeded Mr. Crockett confirmed to Plaintiff Dejanette that his rent share had been improperly heightened from the beginning of his tenancy. Plaintiff Dejanette's rent share was then adjusted down to $25. However, that same manager failed to retroactively adjust Plaintiff Dejanette's ledger, and CMHA has never returned the excessive rent payments that it received.

165. During his tenancy, Plaintiff Dejanette was subjected to Mr. Crockett's theft

scheme. At or around the time of Plaintiff Dejanette's move-in, Mr. Crockett instructed him to leave the "To" line of his money orders blank, telling him it was "hard to open up the system," that he would "take care of it," and that it was "hard to get into the portal." Plaintiff Dejanette complied and submitted blank money orders to Mr. Crockett over many months. Not all payments were stolen; the full amount diverted will require a review of his account history to determine what is missing. Plaintiff Dejanette also gave Mr. Crockett cash at move-in and completed his income certification with him at that time.

166. Mr. Crockett repeatedly harassed, pressured, and threatened Plaintiff Dejanette regarding rent and potential eviction. After Plaintiff made complaints about lack of access to building amenities and the pool room, Mr. Crockett threatened him with eviction for "messing around." Threats of this nature were possible due to Defendants' policy of and practice of giving on-site property managers unfettered discretion. This discretion—which residents were aware of—permitted property managers to exploit residents without repercussion.

167. On April 8, 2026, Plaintiff Dejanette received an NLT from Defendant TPS alleging a past-due balance of $1—and then, a few pages later, a staggering and incompatible past-due balance of $7,952.00. The NLT failed to include adequate recertification information or information on the federally mandated hardship exemption program for CMHA's minimum rent policy.

168. Shortly after the NLT was issued, the new building manager (who was on-site the same day) asked Plaintiff Dejanette to return and surrender his NLT. Plaintiff Dejanette refused.

169. The rent listed at the top of the ledger attached to Plaintiff Dejanette's NLT is $688. This number is wholly inaccurate: the remainder of the ledger demonstrates that Plaintiff Dejanette's rent share has never been $688. It does not correspond to the $682 monthly rent share

that Mr. Crockett improperly set at the outset of Plaintiff Dejanette's tenancy (itself in excess of the federally permissible amount based on his income) nor does it reflect the $25 monthly rent share to which Plaintiff Dejanette was entitled upon recertification. Yet Defendants' accounting inconsistencies grow only more indecipherable as the ledger progresses.

170. For example, following Mr. Crockett's termination in December of 2025, Defendants' own ledger shows Plaintiff Dejanette with a balance of -$609. But on January 27, 2026, Defendants assess a lump sum charge of $6,208 to Plaintiff Dejanette's ledger without explanation.

171. CMHA's assessment of charges beyond Plaintiff Dejanette's proper rent share and its failure to produce a coherent, itemized ledger to accompany its proposed lease termination constitutes an ongoing violation of federal law.

172. Plaintiff Dejanette engaged in protected activity under Ohio Rev. Code § 5321.02 by complaining to CMHA/TPS about habitability and account issues, testifying before Cincinnati City Council, submitting a formal written grievance to CMHA, and speaking to media. In direct response to this protected activity, Defendants threatened eviction and refused to provide timely ledger access.

173. As a direct and proximate result of Defendants' conduct, Plaintiff Dejanette has suffered damages including financial harm from stolen and misapplied rent payments, exposure to fabricated charges and an improper NLT, potential loss of his housing subsidy, and emotional distress and anxiety.

***Plaintiff Shane White's Experience***

174. Plaintiff White entered into a residential lease agreement with Defendant CMHA for the property in 2015 and has continually renewed that lease since. That lease currently

incorporates CMHA's obligations under Chapter 5321 of the Ohio Revised Code and applicable federal law.

175. During his tenancy, Plaintiff White was subjected to Mr. Crockett's theft scheme. On many different occasions, Mr. Crocket instructed Plaintiff White to leave the "To" line of his money orders blank when paying rent. Plaintiff White complied and submitted blank money orders to Mr. Crockett over many months. Mr. Crockett's name later appeared on the "To" line on copies of those money orders.

176. Plaintiff White periodically requested a copy of his account ledger from Mr. Crockett during his tenancy. At one point, Mr. Crockett provided Plaintiff White a ledger dated October 30, 2025, which showed that, as of July 13, 2025, Plaintiff White had a credit on his account in the amount of $15,340.00.

177. Plaintiff White sought a refund of the overpayment reflected on Defendants' ledger, but he was denied. In April of 2026, the current on-site manager for the Evanston provided another ledger, which still showed that, as of July 13, 2025, Plaintiff White had a credit of $15,340. The on-site manager could not or would not explain why Plaintiff White's ledger stops at July 13, 2025.

178. Despite the significant credit reflected on Plaintiff White's ledger, Defendant's on-site property manager next insisted that Plaintiff White was actually in arrears. The manager hand-wrote a balance of $3,562 on top of the new, April ledger. He made no attempt to reconcile that figure with the $15,340 credit shown on the last line of the same ledger.

179. The $3,562 past-due balance asserted by Defendants' property manager is entirely incompatible with Plaintiff White's account ledger, and it demonstrates the ongoing danger posed by Defendants' inability to manage its rental accounts. This staggering level of a lack of reliable data on ledgers violates federal law.

180. Plaintiff White has never been given a reliable, itemized accounting of his payment history or the basis for the charges on his account and faces the imminent threat of lease termination and loss of his subsidized housing at any time.

***Plaintiff Risha Wheeler's Experience***

181. Plaintiff Risha Wheeler entered into a residential lease agreement with Defendant CMHA for her apartment in 2017, and has continuously renewed her lease since. That lease incorporated CMHA's obligations under Chapter 5321 of the Ohio Revised Code and applicable federal law.

182. During her tenancy, Plaintiff Wheeler was subjected to Mr. Crockett's theft scheme. When Plaintiff Wheeler explained she needed to insert the "T" number on the checks, Mr. Crockette responded that he "would take care of it." Mr. Crockett further informed her not to place money orders in the mailbox, but to hand deliver her money orders to him, as was the preference of upper management.

183. Like Plaintiff Barnes, Plaintiff Wheeler discovered that three of her money orders were forged by Mr. Crockett. One, posted August 14, 2024, had the "To" line filled in with "Dion Crockett" with the signature "David Brown;" that another posted on July 3, 2024 had the "To" line filled in with "Dion Crockett" with the signature "James Horn;" and that a third posted on December 16, 2024 had the "To" line filled in with "Dion Crockett" with her signature.

184. Plaintiff Wheeler believes that other individuals were involved with this threat. On one occasion, a maintenance worker at the Evanston named Greg informed her that he could accept her money order when Mr. Crockett was out of office on vacation. Greg informed her that he spoke with a manager at another building who confirmed his ability to collect her money order.

185. Moreover, while Plaintiff Wheeler's regular rent rate would be $634 per month, her

current rent rate is $25 per month because of her work status. Defendants failed to accurately track her rent owed, improperly applying the greater rental amount despite her only owing $25 per month, causing her to accrue an inaccurate ledger balance.

186. Despite making timely rent payments, and although Plaintiff Wheeler has not received an NLT, she has received a letter from Defendants informing her that she owes $5,000 in outstanding rent that she believes to be inaccurate.

187. As a direct and proximate result of Defendants' conduct, Plaintiff Wheeler has suffered financial harm from the theft of her rent payments, exposure to fabricated past-due charges and significant emotional distress.

## CLASS ACTION ALLEGATIONS

188. Plaintiffs bring this action individually and on behalf of all other persons similarly situated, pursuant to the Federal Rule of Civil Procedure 23.

189. Specifically, Plaintiffs propose the following Class definitions, subject to amendment as appropriate:

> **All individuals who are residents of Defendant CMHA who have ledgers and/or RentCafe accounts maintained by Defendant TPS (the "Class").**
>
> **All CMHA residents at locations where Mr. Crockett worked or was assigned for any period of time (the "Crockett Theft Subclass").**
>
> **Any CMHA tenants who have ledgers and/or RentCafe accounts managed by Defendant TPS and who received a Notice of Lease Termination from Defendants for nonpayment of rent and/or who were subject to eviction for nonpayment of rent ("NLT Subclass").**

190. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

191. Plaintiffs reserve the right to modify or amend the definition of the proposed Class and Subclasses, as well as add subclasses, before the Court determines whether certification is appropriate.

192. The proposed Class meets the criteria for certification under Rule 23(a), (b)(1)(a), (b)(2), and (b)(3).

193. Numerosity. The Evanston is composed of approximately 100 units, and Defendant TPS manages 16 of Defendant CMHA's properties, totaling hundreds of units. Upon information and belief, additional residents were affected by Defendants' deficient account management system and Mr. Crockett's theft scheme during his tenure from 2023 through 2025. The inclusion of current tenants, former tenants displaced during that period, and residents against whom eviction proceedings were filed renders the Class sufficiently numerous that joinder of all members is impracticable.

194. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants knew or should have known that property manager Mr. Crockett was systematically stealing tenant rent payments through his cash and blank money order scheme;

b. Whether Defendants failed to maintain satisfactory procedures for processing and tracking of rent payments and to keep and produce accurate tenant account ledgers in compliance with applicable federal regulations;

c. Whether the NLTs issued by Defendants to tenants, including those residing at the Evanston, were based on fabricated, erroneous, or unverified past-due balances;

d. Whether the NLTs issued by Defendants to tenants, including those residing at the Evanston, were based on unlawful retaliation for tenants' public statements regarding Crockett's theft and Defendants' mismanagement of their properties;

e. Whether Defendants' NLTs failed to include required information regarding tenants' rights and relevant procedures to pay past-due rent, to seek recertification, or to seek a hardship exemption from payment of minimum rent in violation of federal regulations;

f. Whether Defendants threatened to pursue attorney fees in nonpayment eviction proceedings in violation of Ohio law;

g. Whether Defendants violated Class Members' constitutionally protected property interests in their housing vouchers and tenancies;

h. Whether Plaintiffs and Class Members are entitled to compensatory actual and/or statutory damages;

i. Whether Plaintiffs and Class Members are entitled to punitive damages;

j. Whether Plaintiffs and Class Members are entitled to attorneys' fees;

k. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

195. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like all other Class Members, are current or former tenants of CMHA/TPS's properties, including the Evanston, and were subjected to the same systemic management failures: deficient account management systems, stolen or misapplied rent payments, fabricated or incomprehensible account ledgers, non-compliant Notices of Lease Termination, and a coordinated pattern of

unlawful eviction activity by Defendants.

196. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of Class Members. Plaintiffs' counsel are competent and experienced in litigating class actions.

197. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members. The common issues arising from that conduct substantially predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

198. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. This factor weighs particularly heavy where, as here, Class Members are low-income individuals with limited financial means and facing heightened risk of homelessness. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

199. Class certification is also appropriate. Defendants acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate to the Class as a whole.

200. Finally, the Class is clearly defined and objectively ascertainable.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the United States Housing Act**
**Adverse Action**
**42 U.S.C. § 1983, 24 C.F.R. § 247.4**
***(On Behalf of Plaintiffs and the Class Against All Defendants)***

201. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

202. CMHA is a "person" within the meaning of 42 U.S.C. § 1983. As a political subdivision of the state of Ohio operating a federally funded public housing program pursuant to 42 U.S.C. § 1437 et seq., CMHA acts under color of state law.

203. TPS is likewise a "person" within the meaning of 42 U.S.C. § 1983. TPS acts under color of state law jointly with CMHA: (1) TPS shares CMHA's principal place of business; (2) administers CMHA-owned properties exclusively under CMHA's federal statutory authority; and (3) exercises that authority to issue legally operative adverse action notices and initiate eviction proceedings that deprive tenants of constitutionally protected property interests. At all relevant times herein, TPS's conduct in administering public housing tenancies is fairly attributable to the state. TPS, however, is a private non-profit corporation and does not constitute a "political subdivision" under Ohio Rev. Code 2744.01(F).

204. Pursuant to the federal law governing subsidized housing, Defendants' residents pay a reduced rent typically equal to 30% of their adjusted monthly household income, 10% of their unadjusted monthly household income, or a standard minimum rental amount, whichever is higher. *See* 42 U.S.C. § 1437a(a).

205. Defendants have adopted a standard minimum rent of $25 for the project-based subsidized housing managed by TPS. However, federal law requires Defendants to "immediately

grant an exemption" to the minimum rent requirement when any family is unable to pay that rent because of a "financial hardship." *Id.*, § 1437a(a)(3)(B)(i).

206. The law provides a nonexclusive set of situations that meet the definition of "financial hardship," including a decrease in income due to loss of employment or whenever a family would face eviction for nonpayment of the minimum rent. *Id.*, § 1437a(a)(3)(C)

207. Under 24 C.F.R. § 5.630(b)(2)(A) and (B), "If a family requests a financial hardship exemption, the PHA must suspend the minimum rent requirement beginning the month following the family's request for a hardship exemption, and continuing until the PHA determines whether there is a qualifying financial hardship and whether it is temporary or long term…. The PHA must promptly determine whether a qualifying hardship exists and whether it is temporary or long term."

208. Under 24 C.F.R. § 5.630(b)(2)(C), the PHA "may not evict the family for nonpayment of minimum rent during the 90-day period beginning the month following the family's request for a hardship exemption." This 90-day waiting period is codified in 42 U.S.C. § 1437a(a)(3)(B)(ii). This subsection further provides that, if the resident demonstrates long-term financial hardship, the PHA must "retroactively exempt the resident from the applicability of the minimum rent requirement for such 90-day period."

209. Whether or not a family is paying minimum rent or eligible for a hardship exemption, Defendants are prohibited from charging rent to their residents in excess of the amounts set by 42 U.S.C. § 1437a(a).

210. If and when Defendants become aware that a resident has over-paid rent based on their actual income, Defendants are required to provide tenants notice of the overpayment and to offer the options of a full, immediate refund or application to future monthly rent payments. *See* HUD Handbook Sections 8-24, 8-25.

211. Despite the clarity of the above-listed laws and implementing regulations, Defendants have adopted an affirmative policy of refusing to consider or grant hardship exemptions—even when Defendants know that a family has no income—unless and until the family formally requests such an exemption.

212. Defendants have further adopted uniform policies and practices of: 1) requiring families who have already shown their entitlement to a long-term hardship exemption to continually re-apply for that same hardship exemption; 2) failing to adequately notify tenants of the availability of, and process for, requesting a hardship exemption (including in Defendants' form NLTs); and 3) pursuing lease termination and eviction proceedings against residents who have successfully obtained a hardship exemption within 90 days of that the residents' application for that exemption.

213. Finally, Defendants' have adopted a uniform policy of refusing to retroactively adjust residents' rent ledgers or refund overpayments, even when residents present clear proof of overpayment acknowledged by Defendants' agents.

214. Defendants have further failed to complete timely recertifications of residents' income, resulting in delayed adjustment of rents and overpayments for families whose income has decreased—overpayments that Defendants then refuse to refund.

215. Defendants' policies regarding the minimum rent hardship exemption, its failure to complete timely recertifications, and its refusal to refund tenant overpayments are in direct violation of 42 U.S.C. § 1437a(a), implementing regulations, and the HUD Handbook.

216. Defendants' policies apply to all residents living in units owned or controlled by CMHA and TPS.

217. As a result of their policies, Defendants have charged or collected from their

residents minimum rent payments and overpayments of rent to which Defendants were not entitled. Defendants have terminated subsidized tenancies for nonpayment of rent where, in fact, residents should have had *de minimis* or zero past due balance.

218. Acting under color of state law and through their affirmative policies and customs, Defendants have violated, and continue to violate, Plaintiffs' and Class Members' rights secured by 42 U.S.C. § 1437a(a), which is actionable pursuant to 42 U.S.C. § 1983.

219. As a result of Defendant's actions, Plaintiffs and Class Members have been injured and suffer continuing injuries. Defendants' pursuit and collection of unpaid rent to which it was not entitled has caused severe financial strain, stress, and undue hardship for Defendants' residents, including wrongful lease termination and eviction.

**COUNT II**
**Violation of 42 U.S.C. § 1983**
**Municipal Liability – Failure to Hire, Train, and Supervise**
***(On Behalf of Plaintiffs and the Crockett Theft Subclass Class Against All Defendants)***

220. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

221. Defendants are persons under 42 U.S.C. § 1983 who acted under color of state law. Plaintiffs have a clearly established and constitutionally protected property interest in their continued subsidized tenancies and housing assistance benefits.

222. Defendants maintained a longstanding custom and practice of permitting on-site property managers to have unsupervised, discretionary, and ultimate control over: (1) collecting rent payments; (2) maintaining tenant account ledgers; (3) handling maintenance requests; (4) communicating with tenants regarding amounts owed; (5) issuing NLTs; and (6) initiating eviction proceedings. This entrenched practice, known to and tolerated by Defendants, was the moving force behind Plaintiffs' and the Crockett Theft Subclass Members' injuries.

223. Over a period of years, Defendants' have engaged in myriad practices, affirmative

acts, and omissions that constitute inadequate hiring, supervision, and training of its on-site property managers, including but not limited to all of the following:

a. Hiring Mr. Crockett without conducting an adequate background investigation, despite his documented criminal history;

b. Granting Mr. Crockett unrestricted access to and authority over vulnerable tenants, including elderly and disabled tenants;

c. Failing to implement policies restricting employees' access to tenant accounts for improper purposes;

d. Failing to monitor past-due rent account balances at their properties, such that they did not notice the tens of thousands of dollars in missing rent payments that Mr. Crockett stole;

e. Failing to implement policies for supervising the conduct of on-site property managers, including in the collection of tenant payments and initiation of lease terminations and evictions; and

f. Creating an environment where on-site employees, including Mr. Crockett, could access and victimize tenants with impunity over the course of several years.

224. Despite repeated claims from residents that their ledgers were inconsistent and that all rental payments had been properly tendered, as well as receiving—on at least one occasion—a letter from a third party informing Defendant TPS of this issue, Defendants affirmatively continued Mr. Crockett's employment with unrestricted access to tenants and the account management system.

225. In so doing, Defendants placed Plaintiffs and Crockett Theft Subclass Members in danger of losing their subsidized tenancies and housing assistance benefits.

226. Defendants then failed to investigate tenants' repeated claims that their ledgers were inconsistent, their rent payments timely, and that their payments had been stolen by Mr. Crockett. Defendants likewise failed to investigate statements from a third party informing Defendant TPS of a specific conversation with Mr. Crockett regarding inaccurate ledgers and improper late fees, wherein she was informed that there was a system-wide error with Defendants' account management system.

227. These failures demonstrate conscience-shocking and deliberate indifference to Plaintiffs' and Crockett Theft Subclass Members' constitutional rights. They further demonstrate Defendants' affirmative custom of tolerance for constitutional rights violations.

228. Upon information and belief, even after terminating Mr. Crockett's employment, Defendants continue to vest their on-site property managers with unfettered discretion over: (1) collecting rent payments; (2) maintaining tenant account ledgers; (3) handling maintenance requests; (4) communicating with tenants regarding amounts owed; (5) issuing NLTs; and (6) initiating eviction proceedings.

229. Defendants' refusal to properly train and supervise its on-site property managers moving forward maintains an environment ripe for abuse and violations of tenants' constitutional rights—as demonstrated by the issuance of the April 8 NLTs at the Evanston and, upon information and belief, other buildings owned by Defendant CMHA and managed by Defendant TPS.

230. These policies were the moving force behind the constitutional violations described herein and demonstrate both deliberate indifference to Plaintiffs' constitutional rights and Defendants' custom of tolerance for widespread constitutional rights violation.

231. Defendants' acts and omissions were the direct and proximate cause of Plaintiffs' and Crockett Theft Subclass Members' injuries described herein, and Defendants are liable for the

damages suffered by Plaintiffs as a result of their property managers' conduct.

232. The facts as set forth in the preceding paragraphs constitute a violation of Plaintiffs' constitutional rights; and pursuant to 42 U.S.C. § 1983, Plaintiffs have a viable claim for compensatory and punitive damages, costs, and attorney fees as set forth in 42 U.S.C. § 1988.

## COUNT III

**Violation of the Due Process Clause**
**U.S. Const., amend. XIV; 42 U.S.C. § 1983**
***(On Behalf of Plaintiffs and NLT Subclass Against All Defendants)***

233. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

234. The Due Process Clause of the Fourteenth Amendment prohibits any state actor from depriving a person of life, liberty, or property without due process of law.

235. At all relevant times, Plaintiffs and NLT Subclass Members have held constitutionally protected property interests in their continued tenancies, arising from the Housing Act, HUD regulations, and their lease agreements with CMHA. These interests are protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

236. The standards for what constitutes due process in the termination of a federally subsidized tenancy are clarified by federal law, implementing regulations, and the HUD Handbook.

237. 42 U.S.C. § 1437f(d)(1)(B), for example, requires that assistance contracts for project-based Section 8 properties provide:

a. That the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable federal, state, or local law, or for other good cause; and

b. That any termination of tenancy shall be preceded by the owner's provision of

written notice to the tenant specifying the grounds for such action.

238. 24 C.F.R. § 247.4 implements these requirements and mandates that termination notices include:

a. A statement that the tenancy is terminated on a specified date;

b. The reasons for termination with specificity sufficient to enable the tenant to prepare a defense;

c. Advice to the tenant of their right to contest the termination in a judicial proceeding; and

d. For nonpayment evictions specifically: (a) the dollar amount of the balance due on the rent account and the date of such computation; (b) an itemized amount of alleged rent owed separated by month; (c) any other arrearages allowed by HUD and included in the lease, separated by month; (d) the date by which the tenant must pay before eviction can be filed; and (e) information on how the tenant can recertify their income, seek a hardship exemption from payment of minimum rent, or enter into a repayment agreement prior to termination.

239. 42 U.S.C. § 1437f and 24 C.F.R. § 247.4 further mandate a right to cure for tenants accused of nonpayment of rent, stating that NLTs must include "instructions on how the tenant can cure the nonpayment of rent violation" and that the "landlord also must not proceed with filing an eviction if the tenant pays the alleged amount of rent owed within the 30–day notification period."

240. Finally, the HUD Handbook Section 8-12 requires Defendants to "be in compliance with applicable federal, state, and local requirements when pursuing termination of tenancy" and "adhere to termination criteria consistently and equitably."

241. Defendants' NLTs to residents, including residents at the Evanston, all use identical,

form language reflective of Defendants' official policies and routine, widespread practices. The content and issuance of the NLTs was explicitly approved by leadership within Defendants' organizations, including individuals in possession of final, policy-making authority.

242. These NLTs are reflective of Defendants' official policy in favor of, and routine, widespread practice of proceeding with, mass lease terminations—regardless of obvious inaccuracies in their own rent accounting systems and facial deficiencies within their form NLTs.

243. At all relevant times herein, Defendants have violated and continue to violate 42 U.S.C. § 1437f, 24 C.F.R. § 247.4, and the HUD Handbook through a pattern of conduct including, but not limited to:

a. Issuing NLTs to Class Members, including those residing at the Evanston, premised on past-due balances that Defendants knew or should have known were either fabricated as a direct result of Mr. Crockett's systematic theft of resident rent payments or as a result of Defendants' deficient account management systems, without first auditing, correcting, or verifying the affected account balances;

b. Issuing NLTs that fail to include an itemized accounting of alleged rent owed separated by month as required by 24 C.F.R. § 247.4, and that are, in any event, premised on account balances so corrupted by Mr. Crocket's theft or Defendants' account management systems error as to be incapable of satisfying the specificity requirement of 24 C.F.R. § 247.4(a)(2);

c. Threatening attorneys' fees that are proscribed by R.C. 5321.13;

d. Failing to properly instruct Class Members of the available processes to recertify their income, seek a hardship exemption from the minimum rent requirement, or enter into repayment agreements prior to termination, as required by 24 C.F.R. §

247.4; and

e. Pursuing and threatening eviction proceedings against Class Members while withholding access to the account ledgers, payment records, and money order histories necessary for those residents to identify, understand, or contest the bases for the alleged balances.

244. Defendants have further deprived Plaintiffs and Class Members of their right to cure their alleged balances and preserve their tenancies through a pattern of conduct including, but not limited to:

a. Issuing NLTs with internally inconsistent past-due balances, such that tenants cannot decipher the amount they are required to pay to preserve their tenancy;

b. Issuing NLTs with inaccurate allegations of unpaid rent, including allegations of past-due rent payments that were stolen and rent charges far in excess of tenants' legally permissible rent shares, rendering it impossible for tenants to pay;

c. Failing to include in the NLT accurate "instructions" for how tenants can tender past-due rent to Defendants, while simultaneously restricting access to the online RentCafé payment portal for tenants with past-due balances; and

d. Refusing or failing to provide updated and accurate ledgers upon request for tenants seeking to pay their past-due balance.

245. Defendants, acting under color of state law, deprived Plaintiffs and NLT Subclass Members of their protected property interests in their subsidized tenancies without following applicable federal law and regulations—and thus without due process of law.

246. These deprivations were not random or unauthorized acts but the direct and foreseeable consequence of Defendants' systemic policies, customs, and practices, for which

CMHA and TPS bear institutional responsibility.

247. Defendants' issuance of hundreds of NLTs, to residents across the TPS portfolio, constitutes an intentional and widespread pattern of conduct necessarily authorized by a final policymaker. At the time Defendants issued the NLTs, including to residents of the Evanston, they knew or should have known that this pattern of conduct was a violation of residents' due process rights. Defendants employed a lawyer as general counsel to review these policies and to enforce them by prosecuting eviction actions.

248. Defendants' refusal to follow its own federally-mandated grievance and document production procedures is, likewise, an intentional and widespread pattern of conduct necessarily authorized by a final policymaker—a pattern pursued with the intention of covering up the scandal of Mr. Crockett's theft and Defendants' failure to properly maintain rental accounts.

249. At all relevant times, Defendants knew or should have known that tenants are not required to file formal police reports to be entitled to review and contest their own rental ledgers. Defendants knew or should have known that refusing to meet with or produce documents to residents who have been issued NLTs is a pattern of conduct in violation of residents' due process rights. Defendants chose to undertake these patterns of conduct regardless, and did so with the explicit authorization of CMHA and TPS leadership.

250. Defendants' conduct violates the Due Process Clause of the Fourteenth Amendment. At all times relevant to this action, Defendants chose to acquiesce in widespread violations of their residents' constitutional rights, demonstrating the custom of tolerance for federal rights-violations that pervades Defendants' property management systems.

251. As a direct and proximate result of this conduct, Plaintiffs and NLT Subclass Members have suffered the threat of wrongful lease termination and eviction, damage to housing

records, financial harm from fabricated balances and illegal fees, loss of housing stability, and emotional distress.

252. Plaintiffs and Class Members seek all available relief against Defendants, including injunctive and declaratory relief, compensatory damages, and attorneys' fees. As against Defendant TPS, Plaintiffs and NLT Subclass Members additionally seek punitive damages.

**COUNT IV**
**Violation of the Due Course of Law Clause**
**Ohio Const., art. I, § 16**
**(*On Behalf of Plaintiffs and the Class Against CMHA and TPS*)**

253. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

254. Article I, Section 16 of the Ohio Constitution provides that "[a]ll courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law[.]" The Due Course of Law Clause prohibits the State and its instrumentalities from depriving persons of protected property interests without fundamentally fair procedures and meaningful notice and opportunity to be heard.

255. At all relevant times, Plaintiffs and Class Members possessed protected property interests in their continued subsidized tenancies and housing assistance benefits arising under federal law, Ohio law, HUD regulations, and their lease agreements with Defendants.

256. Defendant CMHA is a political subdivision and state actor subject to the Due Course of Law protections guaranteed by Article I, Section 16 of the Ohio Constitution. At all relevant times herein, Defendant TPS acted jointly with CMHA and exercised authority delegated by CMHA in administering public housing tenancies, issuing lease termination notices, maintaining tenant ledgers, and initiating eviction proceedings.

257. Defendants deprived Plaintiffs and Class Members of their protected property interests without due course of law through actions including, but not limited to:

a. Issuing NLTs premised on account balances that Defendants knew or should have known were inaccurate, fabricated, corrupted by theft, or otherwise unreliable;

b. Issuing NLTs that failed to provide coherent, itemized, accurate, or comprehensible notice of the grounds for termination sufficient to permit tenants to understand, verify, or contest the alleged basis for adverse action;

c. Maintaining and relying upon account ledgers containing unexplained charges, retroactive bulk adjustments, internally inconsistent balances, and arbitrary rent calculations that deprived tenants of any meaningful ability to determine what amounts, if any, were actually owed;

d. Depriving Plaintiffs and Class Members of meaningful access to their account ledgers, payment histories, and supporting records necessary to contest the alleged balances and preserve their tenancies;

e. Conditioning residents' ability to challenge fabricated balances on the filing of police reports, despite Defendants' independent obligation to maintain accurate tenant account records and comply with applicable grievance and termination procedures;

f. Threatening and pursuing lease termination and eviction proceedings while withholding the information necessary for tenants to exercise their rights to cure, contest, or otherwise defend against the adverse action; and

g. Attempting to retrieve and recover previously issued NLTs from tenants after widespread public reporting regarding Defendants' conduct and anticipated litigation concerning the same.

258. Defendants' conduct was not isolated, random, or unauthorized. Rather, the conduct

described herein constituted systemic practices and policies undertaken pursuant to Defendants' customs, institutional practices, and decisions of officials possessing final policymaking authority.

259. Defendants' issuance of mass NLTs, including to Evanston residents, despite their knowledge of widespread ledger corruption, stolen rent payments, inaccurate balances, and unresolved tenant disputes, constituted arbitrary and fundamentally unfair governmental action in violation of Article I, Section 16 of the Ohio Constitution.

260. Defendants further violated Plaintiffs' and Class Members' rights under the Ohio Constitution by refusing to provide meaningful procedures through which residents could review, understand, challenge, or correct the allegedly past-due balances used to justify termination of their subsidized tenancies.

261. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and continue to suffer the threat of wrongful lease termination and eviction, loss of housing stability, financial injury, damage to housing records, emotional distress, humiliation, anxiety, and other compensable harm.

262. Plaintiffs and Class Members seek and are entitled to all available relief as a result of these violations, including, but not limited to, declaratory, injunctive, and equitable relief, and such additional relief as this Court deems just and proper.

## COUNT V

### Violation of the Ohio Landlord Tenant Act Retaliation Under Ohio Rev. Code 5321.02

***(On Behalf of the NLT Subclass and the Class Against All Defendants)***

263. The NLT Subclass restates and realleges facts set forth above as if fully alleged herein.

264. Ohio law prohibits landlords from retaliating against tenants by increasing rent,

decreasing services, or bringing or threatening to bring an action for possession because a tenant complained to a governmental agency about a health or safety violation, or joined with other tenants to collectively negotiate with the landlord. See Ohio Rev. Code § 5321.02(A).

265. The NLT Subclass residing at the Evanston and Class Members engaged in protected activity under R.C. 5321.02(A)(1) by complaining to Defendants and governmental agencies about Mr. Crockett's theft scheme and the resulting fabricated balances, including:

a. Filing complaints with the Cincinnati Police Department regarding Mr. Crockett's theft of rent payments; and

b. Testifying before Cincinnati City Council on January 14, 2026, regarding Mr. Crockett's theft and Defendants' failure to remedy its effects on residents' account balances.

266. In internal documents, CMHA/TPS kept tabs on the tenants who spoke to City Council. There is no good faith reason to do this other than retaliation.

267. In direct response to this protected activity, Defendants issued mass NLTs to the NLT Subclass and Class Members on or about April 8, 2026, only weeks after those residents publicly organized and testified before Cincinnati City Council.

268. The proximity in time between Plaintiffs' and residents' protected activity and Defendants' mass issuance of NLTs demonstrates Defendants' retaliatory intent.

269. Pursuant to Ohio Rev. Code 5321.02(B), the NLT Subclass and Class Members seek all available relief against Defendants, including actual damages and reasonable attorneys' fees.

## COUNT VI

**Violation of the Ohio Landlord Tenant Act**
**Breach of Landlord Duties Under Ohio Rev. Code 5321.12**

***(On Behalf of Plaintiffs and the Class Against All Defendants)***

270. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

271. Plaintiffs and Class Members entered into valid and enforceable residential lease agreements with Defendants. Those lease agreements expressly incorporate Defendants' obligations under Ohio Rev. Code 5321, including its duties to refrain from unlawful acts and administer tenancies in accordance with applicable law.

272. Defendants breached those duties by:

a. Permitting and failing to remedy inaccurate and deficient account management systems, resulting in inaccurate past due balances, improper late fees, and wrongful eviction proceedings;

b. Permitting and failing to remedy the theft of tenant rent payments, resulting in fabricated past-due balances and wrongful eviction proceedings;

c. Pursuing unlawful lease terminations and evictions; and

d. Threatening to seek unlawful attorney fees in nonpayment eviction proceedings.

273. As a result of Defendants' conduct, Plaintiffs and Class Members have suffered significant damages, including but not limited to:

a. Loss of use and enjoyment of their homes;

b. Financial harm, including through the receipt and payment of improper and illegal fees and fabricated charges; and

c. Emotional distress, inconvenience, and other non-economic harms.

274. Pursuant to Ohio Rev. Code 5321.12, Plaintiffs and Class Members seek all available relief against Defendants, including actual damages.

## COUNT VII

**Violation of the Ohio Landlord Tenant Act**
**Unlawful Acts Under Ohio Rev. Code 5321.15**
***(On Behalf of Plaintiffs and the Class Against All Defendants)***

275. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

276. Ohio landlords are strictly prohibited from "initiat[ing] any act," including "termination of utilities or services" and "threat of any unlawful act," for purposes of recovering possession of a residential premises. Ohio Rev. Code 5321.15. A landlord who violates this section is liable in a civil action for all damages caused to a tenant, together with reasonable attorneys' fees. Ohio Rev. Code 5321.15(C).

277. At Defendants' properties managed by TPS, Defendants have openly and blatantly violated Ohio Rev. Code 5321.15 by taking the following actions, including, but not limited to:

a. Issuing non-compliant NLTs to Plaintiffs and Class Members based on fabricated past-due balances attributable to Mr. Crockett's theft;

b. Issuing non-compliant NLTs to Plaintiffs and Class Members based on errors attributable to Defendants' deficient account management system;

c. Threatening unlawful evictions and imposition of unlawful attorney fees; and

d. Maintaining and issuing account ledgers that fail to comply with federal itemization requirements, thereby threatening evictions based on fabricated past-due balances.

278. Each unlawful act listed above is threatened and pursued by Defendants to facilitate its recovery of possession of residential premises in the event of conflict with its tenants, including those who have challenged Defendants' fabricated past-due balances, organized to assert their legal rights, or otherwise come into conflict with Defendants over the administration of their tenancies.

279. Pursuant to Ohio Rev. Code 5321.15, Plaintiffs and Class Members seek all

available relief against Defendants, including compensatory damages, punitive damages, disgorgement of all unlawfully obtained amounts, and reasonable attorneys' fees.

## COUNT VIII

### Breach of Contract

***(On Behalf of Plaintiffs and the Class Against All Defendants)***

280. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

281. Plaintiffs and Class Members entered into valid and enforceable residential lease agreements with Defendants as their landlord. Those lease agreements incorporate applicable HUD regulations, Ohio law, and Defendants' obligations under its Annual Contributions Contract with HUD.

282. At all relevant times, Plaintiffs and Class Members materially performed their obligations under their lease agreements, including tendering rent payments in the manner required.

283. Nevertheless, Defendants breached those lease agreements by:

a. Failing to properly credit rent payments made by Plaintiffs and Class Members to their accounts, resulting in fabricated past-due balances;

b. Issuing NLTs and initiating eviction proceedings based on those fabricated balances, in violation of lease terms and incorporated federal regulations;

c. Collecting rent in excess of the amount permitted by 42 U.S.C. § 1437a(a); and

d. Threatening to pursue attorney fees as a condition of dismissing eviction proceedings, in violation of Ohio law and lease terms.

284. As a direct and proximate result of Defendants' breaches, Plaintiffs and Class Members have suffered damages including:

a. The threat of wrongful lease termination and eviction;

b. Potential damage to housing records;

c. Emotional distress and anxiety; and

d. Financial harm from stolen and misapplied rent payments.

285. Plaintiffs and Class Members seek all available relief including compensatory damages and attorneys' fees.

**COUNT IX**

**Negligent Hiring, Supervision, and Retention, Common Law**
***(On Behalf of Plaintiffs and the Crockett Theft Subclass Against Defendants)***

286. Plaintiffs restate and reallege facts set forth above as if fully alleged herein.

287. Plaintiffs' and Crockett Theft Subclass Members' injuries—the threat of wrongful lease termination and eviction, damage to their housing records, and threatened loss of their protected property interest in their continued subsidized tenancies and housing assistance benefits—occurred within the grounds of Defendants' properties, and as a result of defects within Defendants' account management system.

288. At all relevant times, Defendants had a duty to exercise reasonable care in hiring, supervising, and retaining Mr. Crockett during his employment, including at the Evanston, to ensure residents' safety.

289. In 2023, Defendant TPS was directly responsible for hiring Mr. Crockett as an on-site property manager with unsupervised and ultimate control over:

a. Collecting rent payments;

b. Maintaining tenant account ledgers;

c. Handling maintenance requests;

d. Communicating with residents regarding amounts owed;

e. Issuing NLTs; and

f. Initiating eviction proceedings.

290. Standard hiring practices for on-site property manager positions involve at least basic criminal background checks.

291. Defendants negligently failed to ensure even the most basic procedures were followed in hiring Mr. Crockett. Had even a basic criminal background search been completed, Defendants would have discovered Mr. Crockett's many criminal charges, including his convictions in 2002 and 2023 for forgery and menacing, respectively.

292. This information was readily available through a basic criminal background check. Defendants' negligent hiring directly enabled Mr. Crockett to access and victimize Plaintiffs and Crockett Theft Subclass Members with impunity and over the course of several years.

293. Defendants are directly liable for the negligent hiring of Mr. Crockett to the extent that Defendants failed to enact and follow appropriate policies requiring proper hiring practices necessary to ensure resident safety.

294. After hiring Mr. Crockett, Defendants negligently failed to supervise him despite significant warning signs, including repeated claims from residents that their ledgers were inconsistent and that all rental payments had been properly tendered, as well as receiving, on at least one occasion, a letter from a third party informing Defendants of this outstanding issue.

295. Despite these warning signs, many of which were observable on Defendants' properties and within their systems, Defendants failed to investigate or question Mr. Crockett, implement monitoring programs for property managers, restrict Mr. Crockett's control over resident rent payments, or establish policies regarding residents' rent payments, late fee payments, and eviction commencement process. This failure enabled Mr. Crockett to repeatedly steal from Plaintiffs and Class Members during his employment as an on-site property manager.

296. Defendants are directly liable for the negligent supervision of Mr. Crockett to the extent that they failed to enact appropriate policies requiring observance of proper employment practices necessary to ensure resident safety.

297. As a direct and proximate result of these breaches, Plaintiffs and Crockett Theft Subclass Members have suffered damages in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Defendants as follows:

1. For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

2. For judgment against Defendants for payment of any and all damages, including treble damages and attorneys' fees, and any other amounts owed pursuant to the Ohio Revised Code, the United States Code, and the common law, and order payment of interests and costs as permitted by law;

3. For an injunction requiring Defendants to remedy its violations of federal and state law and to restrain it from further violations;

4. For actual, statutory, nominal, consequential, double, treble, and punitive damages, as allowed by law;

5. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

6. For prejudgment interest on all amounts awarded; and

7. Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury of all issues so triable herein.

Dated: June 25, 2026

Respectfully submitted,

_s/*Pierre H. Bergeron*________

Pierre H. Bergeron (0071402)
Paul M. De Marco (0041153)
Isabel C. DeMarco (0103550)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
pbergeron@msdlegal.com
idemarco@msdlegal.com

Shannon Price (0100744)
**PRICE LAW LLC**
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
shannonp1295@gmail.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of June 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notification of such filing to all counsel of record.

Jeffrey C. Mando
Daniel E. Linneman
ADAMS LAW, PLLC
40 West Pike Street
Covington, KY 41011
*jmando@adamsattorneys.com*
*dlinneman@adamsattorneys.com*

_s/*Pierre H. Bergeron*__________________________
Pierre H. Bergeron (0071402)